UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

CORTEZ WILLIE SHIELDS,

                    Plaintiff,                    CASE NO. 17-CV-267

v.

DAVE MAHONEY, SGT. SKERPENSKI,
LT. IMMEL, DEPUTY MERRIL, CAPT. ANHALT,
and LT. PIERCE,

                    Defendant.

**BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

      Defendants, Dave Mahoney, Sgt. Skerpenski, Lt. Immel, Deputy Merrill, Capt. Anhalt, and Lt. Pierce, by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C. respectfully submit this Brief in Support of Their Motion for Summary Judgment.

## <u>INTRODUCTION</u>

      Cortez Willie Shields (hereinafter "Shields") alleges the Defendants violated his constitutional rights by subjecting him to mold and to water contaminated with lead while he was incarcerated at the Dane County Jail. However, the undisputed facts establish that Shields' constitutional rights were not violated. The Defendants maintained extensive cleaning policies and enacted aggressive mitigation efforts to ensure the safety of all inmates and staff at the Dane County Jail and to maintain the overall cleanliness of the Jail. Defendants are, therefore, entitled to summary judgment as a matter of law under the Fourteenth and Eighth Amendments and are further entitled to immunity.

## FACTUAL BACKGROUND

I.  **SHIELDS' CONFINEMENT AT DANE COUNTY JAIL.**

Shields' complaints regarding the conditions at the Dane County Jail stem from three confinements there spanning from January 2, 2015 through January 27, 2017. (DFOF ¶ 6.)

Shields was booked at the Dane County Jail on January 2, 2015 on a probation officer hold. (DFOF ¶ 7.) On December 24, 2015, Shields bonded out. (DFOF ¶ 8.) On February 16, 2015, a criminal complaint was filed against Shields related to the January 2015 probation hold. (DFOF ¶ 9.)

On May 3, 2016, Shields was again booked at the Dane County Jail and his bail was revoked after he violated a no contact order. (DFOF ¶ 10.) On the same day, Shields pleaded guilty to domestic abuse (repeater) and false imprisonment (repeater), and a charge of strangulation was dismissed but read in. (DFOF ¶ 11.) Shields was sentenced on August 9, 2016 and was released on probation the same day. (DFOF ¶ 12.)

On September 30, 2016, Shields was booked again at the Dane County Jail on a probation hold. (DFOF ¶ 13.) Shields' probation was revoked on November 2, 2016. (DFOF ¶ 14.) Shields was transferred out of Dane County Jail and to Dodge Correctional on January 27, 2017. (DFOF ¶ 15.)

II.  **CONDITIONS AT THE DANE COUNTY JAIL.**

The Dane County Jail consists of three facilities: the City-County Building, the William H. Ferris, Jr. Center, and the Public Safety Building. (DFOF ¶ 16.) The City-County Building was constructed in 1955. (DFOF ¶ 17.) The 6th and 7th floor are currently part of the Dane County Jail. (DFOF ¶ 18.) In 1982 the William H. Ferris, Jr. Center was constructed as a Huber Law facility and an expansion occurred in 1991. (DFOF ¶ 19.) In 1994, the Public Safety

Building was constructed and includes 400 additional beds, office space for the Dane County Sheriff's Department, and the Department of Emergency Government. (DFOF ¶ 20.)

### a. GENERAL CLEANLINESS.

During the events at issue in this lawsuit, Dane County Jail had in place a policy to ensure the highest standards of sanitation in the Jail. (DFOF ¶ 21.) Under this policy, any deputy that becomes aware of a sanitary issue arising during the deputy's shift was required to address the sanitary issue and to further notify building maintenance, if necessary. (DFOF ¶ 22.) The policy also requires routine inspections by Jail Administration as well as inspections by State of Wisconsin jail inspectors and the Dane County Board Committee. (DFOF ¶ 23.)

The Dane County Jail allows inmates to clean their own cells and shower areas and utilizes inmate workers and outside contractors for additional deep cleaning and/or abatement work. (DFOF ¶ 24.) At 4:45 a.m. each morning inmate workers in the City-County Building put together cleaning buckets to be placed inside each cell block. (DFOF ¶ 25.) The cleaning bucket contains: a bucket with mop, cleaning solution in bucket (disinfectant cleaner), spray bottle with cleaning solution (disinfectant cleanser), rags, broom, dust pan, garbage bags, and a shower brush. (DFOF ¶ 26.) During the 5:00 a.m. security check, cleaning buckets are placed in all cell blocks. (DFOF ¶ 27.) Cleaning buckets remain in all cell blocks through morning head count, at approximately 8:30 a.m. (DFOF ¶ 28.) During this time, inmates may clean their cells and shower areas. (DFOF ¶ 29.) Throughout the day, and as needed, inmates are also allowed cleaning supplies upon request. (DFOF ¶ 30.)

In addition to daily cleaning, Dane County Jail conducts a detailed quarterly cleaning. (DFOF ¶ 31.) As part of the quarterly cleaning, every three months, inmate workers clean all

showers and shower curtains using strong disinfectants such as Lime-Away and Mold Stat. (DFOF ¶ 32.)

The Dane County Jail maintains Mold-Stat in stock at all times. (DFOF ¶ 33.) Mold-Stat is a hydro peroxide-based solution that can be sprayed on mold to kill the mold, such that it is not a health risk. (DFOF ¶ 34.) However, while it will kill the mold and nullify health risks, Mold-Stat will not remove the color or the stain created by mold because it is not a stain remover. (DFOF ¶ 35.) Dane County Jail deputies and supervisory staff have access to and may use Mold-Stat at any time, if new mold is detected. (DFOF ¶ 36.)

### b. WATER TESTING.

Dane County Jail uses Public Health – Madison / Dane County to conduct lead testing in its water supply. (DFOF ¶ 37.)

On May 17, 2016, the consultant team of Mead and Hunt, Potter Lawson and Associates and Pulitzer, Bogard and Associates released a Preliminary Report as part of a Dane County Jail Updates Summary. (DFOF ¶ 38.) This report indicated, but did not confirm, that lead may be present in the water supply of the Dane County Jail due to the age of the facility. (DFOF ¶ 39.)

On June 15, 2016, Dane County received an inquiry from Flint, Michigan regarding how Dane County had mitigated water quality concerns in the early 2000s, and Dane County Director of Facilities, Greg Brockmeyer, began investigating lead in the Dane County water supply. (DFOF ¶ 40.)

On July 1, 2016, Brockmeyer met with Dane County Jail Captain Anhalt to discuss the Flint, Michigan inquiry and water lead mitigation efforts. (DFOF ¶ 41.) From this discussion, it was determined that updated, random testing would be conducted in the City-County Building of the Dane County Jail. (DFOF ¶ 42.)

Brockmeyer then organized the testing of random samples from cellblocks in the City-County Building. (DFOF ¶ 43.) On July 29, 2016, 20 random samples were taken from cellblocks in the City-County Building. (DFOF ¶ 44.) These tests were all first-draw samples taken primarily from cells that had been vacant and unoccupied for a period of time. (DFOF ¶ 45.) On August 16, 2016, Brockmeyer and the Dane County Jail were notified that three of the twenty random samples taken were slightly elevated above the 15 μg/L level recommended by the EPA. (DFOF ¶ 46.)

On August 18, 2016, a Dane County stakeholders meeting was held where the issue of water quality was discussed. (DFOF ¶ 47.) At that time, it was decided that all consumable water sources in the Dane County Jail would be tested for lead. (DFOF ¶ 48.) It was also determined that water filtration systems would be installed across the entirety of the Dane County Jail's cold water supply. (DFOF ¶ 49.) Dane County Jail then submitted a request to Hooper Plumbing in Madison, WI to install water filtration systems across the Jail. (DFOF ¶ 50.)

On August 19, 2016, while awaiting the installation of water filtration systems, and at the suggestion of Public Health – Madison/Dane County, signs were posted throughout the Dane County Jail, and including in cells, stating the following:

> While we are exploring options for the replacement of the City-County Building Jail, many systems are being tested.  In addition, we have received concerns from inmates.  As we test these systems, we ask for your patience.
>
> In the next couple of weeks, we will be collecting water samples overnight. Public Health recommends that the water be run for 1-2 minutes or until it gets cold prior to drinking.  They recommend that you do not use hot water for consumption.

(DFOF ¶ 51.)

The water system at the Dane County Jail runs through copper piping that may include lead joints, which may dissolve in the water when the water is still. (DFOF ¶ 52.) When the

water is allowed to run for a few minutes prior to drinking, the possibility of lead dissolving in the water dissipates. (DFOF ¶ 53.) However, there is no difference between lead levels in hot and cold water; rather, the signs directing not to drink the hot water were because initial plans indicated that only cold water systems would receive filtrations. (DFOF ¶ 54.) It was later decided that both hot and cold water would receive filtration systems. (DFOF ¶ 55.)

From August to October 11, 2016, all consumable water sources in the Dane County Jail were tested for lead. (DFOF ¶ 56.) The results indicated that less than 5% of the cells in the Dane County Jail tested for lead levels slightly above the EPA recommendation. (DFOF ¶ 57.)

On October 31, 2016, another stakeholders meeting was scheduled to discuss the most recent testing results and to determine a course of action. (DFOF ¶ 58.) At this meeting, it was determined an additional sticker would be affixed above all water fountains reminding inmates to run water for two minutes prior to drinking, to install filters over fountains that had tested with higher levels of lead, and to replace fixtures and piping throughout the jail to mitigate potential sources of lead. (DFOF ¶ 59.)

On November 22, 2016, Hooper Plumbing began installing Matrikx water filtration systems across the Jail and including both the hot and cold water supplies. (DFOF ¶ 60.) The Matrikx filtration system is designed as carbon block filters for chlorine taste and odor, VOC, cyst and – importantly – lead reduction. (DFOF ¶ 61.) On December 8, 2016, stickers were ordered and affixed above each inmate water fountain advising that water should be run for two minutes prior to consumption. (DFOF ¶ 62.)

Since installing the Matrikx water filtration system, in November of 2016, the Dane County Jail's water supply is tested quarterly and has never shown lead levels above the recommended safe level of 15 μg/L. (DFOF ¶ 63.)

**III.** **SHIELDS' COMPLAINTS AND INTERACTIONS WITH DEFENDANTS**.

    **a.** <u>ALLEGATIONS REGARDING MOLD</u>.

Shields alleges that there was mold in the showers and in some of the cells at the Dane County Jail. (DFOF ¶ 64.) However, Shields has no evidence that any alleged substance he complains of actually is mold – he has no pictures of the alleged mold and has no evidence of any testing done on the alleged mold to determine whether the substance was alive and/or otherwise harmful. (DFOF ¶ 65.) Nor does Shields have any expertise or experience dealing with mold. (DFOF ¶ 66.)

Shields acknowledges that the Jail allows inmates to clean their own cells. (DFOF ¶ 67.) Cleaning supplies are available to inmates, and inmates do not have to ask permission to clean their own cell. (DFOF ¶ 68.)

    **b.** <u>ALLEGATIONS REGARDING LEAD</u>.

Shields does not have any expertise or training on lead, water quality, or mold. (DFOF ¶¶ 69-70.) He has no evidence to support his allegation that he was actually exposed to unsafe lead levels in the Dane County Jail apart from speculation and a belief that the Jail "was old." (DFOF ¶ 71.)

Shields first became aware of the possibility of lead in the Dane County Jail water supply after seeing news reports and through responses to his grievances. (DFOF ¶ 72.) Shields has not tested the Dane County Jail's water supply for lead or other hazardous materials. (DFOF ¶ 73.) His only evidence that there were dangerous levels of lead in the water is that he was instructed not to drink the hot water. (DFOF ¶ 74 (Q: what evidence do you have to support your contention that there are unsafe levels of lead in the water at the Dane County Jail? A: What they

– they told me, as far as do not drink the hot water, it's not for consumption. If you can't drink something, then something have to be wrong with it.").)

Shields remembers that Dane County had placed signs around the Jail instructing inmates to run the water for two minutes prior to consumption. (DFOF ¶ 75.) He recalls seeing signs in both the hallways and in the cellblocks and specifically recalls signs being placed in cellblocks in December of 2016. (DFOF ¶ 76.) Shields also recalls that Dane County had alternatives to water available to inmates, such as Gatorade. (DFOF ¶ 77.)

On June 21, 2016, Shields first filed a grievance complaining generally of the conditions at the Dane County Jail. (DFOF ¶ 78.) This grievance did not complain of mold or lead. (DFOF ¶ 79.) This grievance was responded to by an officer not named as a defendant in this case. (DFOF ¶ 80.) Shields appealed this grievance and the appeal was denied by Lieutenant Immel, who indicated that the issues cited were being evaluated and addressed. (DFOF ¶ 81.)

On October 23, 2016, Shields first filed a complaint regarding water and mold in the Dane County Jail. (DFOF ¶ 82.) This grievance was responded to by an officer not named as a defendant in this case. (DFOF ¶ 83.) The response indicated that "various issues regarding the long term sustainability of the Dane County Jail, City County Building are currently being assessed and evaluated." (DFOF ¶ 84.) Shields appealed this grievance and Lt. Pierce reviewed and denied the appeal. (DFOF ¶ 85.)

On December 14, 2016, Shields filed grievance number 23259. (DFOF ¶ 86.) This grievance acknowledges that signs have been placed around the jail regarding appropriate water consumption and inquiring as to the lead amounts in the water. (DFOF ¶ 87) Shields received the following response from Sergeant Skerpenski:

> I have reviewed your grievance in regards to continued concerns about the water supply in the Dane County Jail, City County Building. Since the time initial

concerns were raised, the Dane County Sheriff's Office has worked diligently with the Public Health Department to conduct testing of the hot and cold water supply of all areas and individual cells. I am pleased to inform you that over 95 percent of the water lines were within established standards. Of the less than 5 percent of water lines which had slightly elevated lead levels, aggressive mitigation steps have been implemented to include some individual cells being taken out of service, filter installation and pipe and fixture replacement. Additional steps such as quarterly water testing and evaluation are being implemented to ensure the health and safety of those consuming the water. Informational stickers will also be displayed in each cell with Department of Public Health recommendations to run all water for 1-2 minutes or until it gets cold prior to drinking and not using hot water for consumption. The Dane County Sheriff's Office strongly encourages all individuals to follow these procedures at all times. I appreciate your patience while this issue was addressed. Please know that Dane County Sheriff's Office takes it's responsibility to care and protect inmates within it's custody very seriously. Hopefully this information will help to alleviate your concerns regarding the water supply in the Dane County Jail, City County Building.

(DFOF ¶ 88.)

Shields appealed this grievance and, on January 14, 2017, Lt. Immel responded with the

following:

I have reviewed your appeal and concur with the investigating supervisor's response. Several months back, the Dane County Sheriff's Office began to examine the possibility of remodeling or replacing the Dane County Jail, City County Building. As part of the process, there were various issues regarding the long term sustainability of the Dane County Jail, City-County Building which were being assessed, evaluated and tested, to include the water supply. While this testing was being completed, the Dane County Sheriff's Office took a proactive approach in providing information and encouraging those who utilize drinking water in the City County Building to following Public Health recommendations, which are the same used for water issues in the general community, until the results of the testing were completed. The recommendation advised everyone to follow Public Health recommendations, which include running the water for 1-2 minutes or until it gets cold prior to drinking and not using hot water for consumption.

Upon completion of the testing, it was determined over 95 percent of the water lines were within established standards and aggressive mitigation steps were implemented to address the remaining 5 percent. Part of the mitigation steps include affixing labels to all of the water supply with the Department of Public Health recommendations. All necessary information pertaining to the water supply has been shared with those who work and/or reside in the Dane County

Jail, City County Building. You should also be aware that the Dane County Jail is inspected annually by the Department of Corrections and has successfully passed each inspection.

(DFOF ¶ 89.)

After learning of the recommendation to run water for two minutes and to not drink hot water, Shields followed these recommendations at all times. (DFOF ¶ 90.)

c. INTERACTIONS WITH DEFENDANTS.

Sheriff Mahoney: Shields has never spoken personally to Sheriff Mahoney regarding his complaints at the Dane County Jail. (DFOF ¶ 91.) He believes that Sheriff Mahoney was aware of his complaints because he saw Sheriff Mahoney on television stating that he either wanted to, or was considering, conducting renovations to the Jail. (DFOF ¶ 92.) Shields believes that Sheriff Mahoney "wanted to do something" about the conditions in the Dane County Jail but that "there was nobody taking no steps to do that." (DFOF ¶ 93.)

Sergeant Skerpenski: The only known correspondence between Shields and Sergeant Skerprenski came through a response to Shields' grievance number 23259. (DFOF ¶ 94.) Shields also alleges that he *may* have tried to complain to Sergeant Skerpenski in passing, but he does not recall the dates or the nature of this interaction. (DFOF ¶ 95.)

Lieutenant Immel: The only known correspondence between Shields and Lieutenant Immel came through the appeals to grievance numbers 21893 and 23259. (DFOF ¶ 96.) Shields alleges that he *may* have tried to complain to Lieutenant Immel in passing. (DFOF ¶ 97.) He does not recall exactly what he said to Lieutenant Immel, but believes that Lieutenant. Immel may have responded by telling him that the Jail was old. (DFOF ¶ 98.)

Deputy Merrill: Shields alleges that he complained to Deputy Merrill stating "Ms. Merril, you see all this mold up here?" and that Deputy Merrill responded that the Jail was old. (DFOF

¶ 99.) Shields also alleges that he told Deputy Merrill that the water had lead in it and she responded that the Jail was old. (DFOF ¶ 100.)

Captain Anhalt: Shields believes that Captain Anhalt is "in administration" and alleges that he spoke with Captain Anhalt once in person about his complaints and that Captain Anhalt responded "they have people to do it, I'll look into it." (DFOF ¶ 101.)

Lieutenant Pierce: Shields only corresponded with Lieutenant Pierce through his appeal to grievance number 22863. (DFOF ¶ 102.) Shields does not recall ever speaking directly to Lieutenant Pierce. ((DFOF ¶ 103 (A: Lieuteant Pierce. Probably inaction is probably was – a couple grievances I have with his name on them. He probably wrote me back saying something – I can't recall him specifically, remembering how he looked or anything like that. I know he was a white shirt. He probably was a lieutenant or something. I think I seen him, but I can't remember, you know, talking to him, like specifically about conditions, but I definitely wrote him though.).)

IV.    **DAMAGES AND CAUSATION.**

Shields has never sought treatment from a medical professional for injuries or illness related to lead, nor has a medical professional ever diagnosed him with a lead-related illness or told him that he had elevated levels of lead in his blood. (DFOF ¶ 104.) Indeed, Shields has never had a blood-lead test conducted. (DFOF ¶ 105.)

Shields has never sought treatment from a medical professional for injuries or illness related to mold, nor has a medical professional ever diagnosed him with a mold-related illness. (DFOF ¶ 106.)

Finally, while Shields has seen mental health professionals in the past, he has never spoken to a mental health professional about the conditions in the Dane County Jail. (DFOF ¶ 107.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if the evidence offered demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Id*. at 322. To defeat summary judgment, parties must produce specific material facts in support of their claims sufficient to sustain their burden at trial. *Id*. at 324. The plaintiff cannot rest on the pleadings, but must demonstrate the existence of sufficient evidence that, if believed by a jury, would support a verdict in his or her favor. *Jelinak v. Greer*, 90 F.3d 242, 243-44 (7th Cir. 1996). Absent a showing that a defendant may be liable, the defendant should not be required to undergo the considerable expense of preparing for and participating in trial. *Anderson*, 477 U.S. at 256-57.

In ruling on a motion for summary judgment, the district court's role is to determine whether there is a genuine dispute as to a fact that is material and outcome determinative. *See Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). The requirement is that there be a genuine issue of material fact. *Anderson*, 477 U.S. at 248; *see also Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990) ("The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary

judgment motion.") The court, faced with a summary judgment motion, must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion must be granted and the case dismissed. *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989).

Here, there is no evidence to support Shields' allegations or to impose liability on any of the named Defendants. The Court should, therefore, dismiss this lawsuit in its entirety.

## ARGUMENT

### I. SHEILDS HAS NOT ALLEGED PERSONAL INVOLVEMENT.

A plaintiff seeking redress under § 1983 must show personal involvement on the part of individual defendants: "a plaintiff must demonstrate personal involvement by showing that defendants knew about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or otherwise turn[ed] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 615 (7th Cir. 2001).

With respect to Sheriff Mahoney and Captain Anhalt, it appears that Shields only names them in his Amended Complaint because of their role as administrative staff. Indeed, Shields admits that he never spoke to Sheriff Mahoney and may have spoken to Captain Anhalt on only one occasion. (DFOF ¶¶ 91-93, 101.) But these officers cannot be held liable under the doctrine of respondeat superior simply because they held a supervisory role. It is well established that a government official is only liable under § 1983 for his or her own misconduct. *E.g., Locke v. Haessig,* 13–1857, 788 F.3d 662, 669, 2015 WL 3528782, at *5 (7th Cir. June 5, 2015). Thus to recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129

S.Ct. 1937, 173 L.Ed.2d 868 (2009). For a supervisor to be liable, they must be "personally responsible for the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). To show personal involvement, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

Additionally, with respect to Sergeant Skrepenski, Lieutenant Immel, and Lieutenant Pierce, Sheilds' only allegations against them are that they responded to his grievance and to his appeal. (DFOF ¶¶ 94-98, 102-103.) But a constitutional violation cannot be premised on a grievance examiner's proper processing of a grievance or appeal. *See e.g. Burks v. Raemisch*, 555 F.3d 592, 595 7th Cir. 2009). Shields only alleges that these officers handled his grievances and appeals. Nowhere does he allege that either Sergeant Skrepenski, Lieutenant Immel, or Lieutenant Pierce acted in any way improperly when reviewing and responding to his grievance and appeal.

Finally, with respect to Deputy Merrill, and with respect to Shields' alleged comments "in passing" to Lieutenant Immel and Captain Anhalt, Shields has not alleged facts that give rise to a constitutional violation. Shields alleges that Deputy Merrill and Lieutenant Immel told him that the Jail was old. (DFOF ¶¶ 98-100.) These allegations do not show that any of these defendants "knew about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or otherwise turn[ed] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 615 (7th Cir. 2001). To the contrary, as reflected in the grievance responses, Jail staff were aware of Captain Anhalt and Dane County's aggressive mitigation plans that were underway to address concerns regarding the Jail's water supply.

Because Shields failed to assert that the named Defendants were personally involved in a deprivation of his constitutional rights, his Amended Complaint should be dismissed in its entirety.

## II. SHIELDS' CUSTODIAL STATUS WAS LIKELY THAT OF BOTH A DETAINEE AND A PRISONER.

During the times at issue in his Amended Complaint, Shields was both a pretrial detainee and a convicted prisoner. *See Bell v. Wolfish*, 441 U.S. 520, 353 n. 16, (1979). From January 2, 2015 – December 24, 2015, Shields was a detainee on a probation hold. (DFOF ¶¶ 7-8.) *See e.g. Russel v. Darr*, case no. 4:15-cv-98, 2015 WL 8055880 n. 3, (M.D. GA, December 4, 2015,) (stating that while on probation hold, plaintiff's claims fell under the Due Process Clause.). On May 3, 2016, Shields' bail was revoked and he plead guilty, bringing his claims into the purview of the Eighth Amendment. (DFOF ¶¶ 10-11.) *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Shields' returned to the Jail on September 30 on probation hold. (DFOF ¶ 13.) His probation was revoked on November 2, 2016, again bringing his claims back under the Eighth Amendment. (DFOF ¶ 14.)

The Fourteenth Amendment is analyzed below and the Eighth Amendment standard is analyzed in the next section. Whatever standard is applied, however, Shields cannot establish a triable claim as a matter of law.

## III. SHIELDS' CLAIM SHOULD BE DISMISSED UNDER THE FOURTEENTH AMENDMENT.

Historically, there has been "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement." *Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015) (citations omitted). Recently,

however, the Seventh Circuit extended the Supreme Court's *Kingsley v. Hendrickson* decision to medical care claims in *Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018).

Under *Miranda*, a pretrial detainee challenging medical care must show (1) whether the defendants acted purposefully, knowingly, or perhaps even recklessly and (2) whether the challenged conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353-354.

Even more recently, in *Hardeman v. Curran*, the Seventh Circuit expressly applied *Kingley's* objective inquiry to all Fourteenth Amendment conditions-of-confinement claims. 933 F.3d 816, 823 (7th Cir. 2019). Thus, a plaintiff must now prove that "the severity and the duration of the conditions experienced were so significant that . . . they violated the Constitution. *Hardeman*, 933 F.2d at 824. "[I]f a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purposes of the governmental action is punishment that may not constitutionally be inflected upon detainees." *Hardeman*, 933 F.3d at 823 *quoting Bell v. Wolfish*, 411 U.S. 520, 539 (1979). The ultimate test is whether alleged conditions and physical harms were *objectively unreasonable*. *Hardeman*, 933 F.3 at 825 (emphasis added).

Since *Hardeman*, district courts in this Circuit have required that plaintiffs alleging Fourteenth Amendment conditions-of-confinement claims prove the following: (1) a deprivation that is objectively, sufficiently serious to deprive the plaintiff of "the minimal civilized measure of life's necessities and (2) the defendant's failure to respond or remedy the situation was objectively unreasonable. *See Lavite v. Eales et. al*. Case No. 19-cv-00953, 2019 WL 6728919 (S.D. Ill., Dec. 11, 2019) *see also, Darnell v. Pineiro*, 849 F.3d 17, 35 (2nd Cir. 2017) ("a pretrial detainee must prove the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition

posed . . . even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety."); *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018) (requiring two-step inquiry).

### a. SHIELDS WAS NOT SUBJECTED TO CONDITIONS SO OBJECTIVELY SERIOUS.

Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); U.S. Const. amend. VIII. Prison conditions that involve unnecessary and wanton infliction of pain as well as those conditions that are grossly disproportionate to the severity of the crime violate the Constitution. *Rhodes v. Chapman*, 452 U.S. 33, 346 (1981).

"The objective analysis focuses on the nature of the defendants' acts, and whether the conditions they were forced to endure exceeded contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). Thus, to meet this first element, "extreme deprivations are required." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "This is necessarily a difficult and imprecise contextual inquiry." *Lunford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).

### i. LEAD.

The mere existence of lead does not support a viable constitutional claim. *See e.g. Mejia v. McCann*, 2010 WL 5149273, No. 08C4534 (N.D. Ill., December 10, 2010). Rather, the level must be dangerous. The *poisoning* of a prison water supply constitutes cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25 (1993). However, prisons are not required to provide a maximally safe environment free of all safety hazards. *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993). Prions are not required to provide inmates with more salubrious air,

healthier food, or a cleaner water supply than is enjoyed by substantial numbers of free Americans. *Id*. at 1234.

For example, in *Carroll v. DeTella*, the Seventh Circuit analyzed an inmate's complaints regarding water quality in two different Illinois prisons. 255 F.3d 470 (7th Cir. 2001). With respect to lead in one of the prisons, the court held that lead in the water was not cruel and unusual punishment when the lead was cause by corrosion of the water in the pipes and when the prison was continuing to treat the problem. *Id*. at 471-72. The prison's water pipes were made of lead that dissolved in the water –" but only when the water is still, as it is overnight, when no one is using it." *Id*. at 472. Inmates were instructed to allow the water to run before drinking it to alleviate the problem. *Id*. The prison was also continuing to review additional mitigation options such as treating or replacing the pipes. *Id*. Such circumstances were "remote from cruel and unusual punishment." *Id*.

The circumstances at the Dane County Jail mirror those described above in *Carroll*. In May and June of 2016, two events triggered Dane County Jail to investigate it's water supply: *First*, the release of the Mead and Hunt, Potter Lawson report, which indicated, but did not confirm, that lead may be present in the water supply of the Dane County Jail due to the age of the facility. (DFOF ¶ 38-39.)  *Second*, Dane County received an inquiry from Flint, Michigan regarding lead-mitigation efforts from the early 2000s. (DFOF ¶ 40.) After investigation and discussion, in July 2016, random testing of the Jail's water supply was ordered. (DFOF ¶ 40-42.) In August, results were received indicating that three of twenty random samples show slightly elevated above the 15 μg/L level recommended by the EPA. (DFOF ¶ 43-46.)

Two days after testing results were received, the Jail began an aggressive two-part mitigation effort. *As to the long-term fix*, it was determined that all consumable water sources

would be tested for lead and that water filtration systems would be installed across the entirety of the Dane County Jail's cold water supply. (DFOF ¶ 47-50.) *As a short-term fix*, and while awaiting the filters, the Jail put up signs and notices around the Jail and in the individual cells instructing inmates to allow the cold water to run prior to drinking it and not to drink the hot water. (DFOF ¶ 51, 59.) Allowing the water to run prior to drinking alleviated the possible lead hazard. (DFOF ¶ 52-53.) Then, the Jail returned its focus to the long-term fix –continued testing and the installation of filtration systems across the Jail. (DFOF ¶ 50, 56.) Testing was completed in October and it was determined that less than 5% of the cells in the Dane County Jail tested for lead levels above the EPA recommendation. (DFOF ¶ 56, 57.)

However, the long-term fix continued. In November 2016, Hooper Plumbing installed Matrikx filtration systems across the Dane County Jail – including in both the hot and cold water supply. (DFOF ¶ 60.) The Matrikx filtration system is specifically designed to reduce lead levels. (DFOF ¶ 61.)

Since the installation of the Matrikx system, Dane County Jail has continued to test its water supply on a quarterly basis and the results have not shown lead levels above the recommended safe levels. (DFOF ¶ 63.)

Shields admits that the County's short and long term plans were successful: once learning of the Jail's warnings regarding the water supply, he ran the water for 1-2 minutes and avoided hot water. (DFOF ¶ 90.) Shields also admits that he was never diagnosed with lead poisoning or any other lead-related illness, nor has he ever sought medical attention for the purpose of receiving treatment for exposure to lead. (DFOF ¶ 104-105.)

At summary judgment, a plaintiff must submit admissible evidence, as opposed to speculation, showing that the water was dangerous. *Jones v. Walker*, 358 F. App'x 708, 711 (7th

Cir. 2009) (holding that the fact that water was discolored was not sufficient to show that it was unsafe). However, Shields presented no evidence that the water at the Dane County Jail presented a health risk to him. Accordingly, his claims must be dismissed.

ii. MOLD.

There is simply no evidence in the record to support Shields' claim that there is dangerous mold in the cells and in the showers at the Dane County Jail. Shields has not provided any evidence of the exact location of the mold, the type of mold, or information regarding whether the alleged mold was hazardous, or even alive.

Shields further admits that he never became sick from the alleged mold or even that he has any independent proof that black mold actually exists in the Dane County Jail. (DFOF ¶ 65, 66, 106 .) Given this testimony, Shields falls short of establishing that these conditions were sufficiently serious. *See Caroll v. DeTella*, 255 F.3d 470, 473 (7th Cir. 2001) ("[F]ailing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not [cruel and unusual punishment.")

Furthermore, Shields acknowledges that Dane County Jail had, and continues to have, policies and procedures for cleaning the Jail that include both inmates cleaning their own cells and inmate-workers cleaning the Jail. (DFOF ¶ 67.)  Indeed, the Jail provides inmates with a cleaning bucket containing a bucket with mop, cleaning solution in bucket (disinfectant cleaner), spray bottle with cleaning solution (disinfectant cleanser), rags, broom, dust pan, garbage bags, and a shower brush every morning. (DFOF ¶¶ 25-30.) Cleaning supplies are also provided as needed, and every three months the Jail conducts a detailed quarterly cleaning wherein the showers and curtains are extensively cleaned and treated for mold. (DFOF ¶¶ 30-32.)

Finally, the Dane County Jail used Mold-Stat to remove live mold from the Jail. (DFOF ¶ 33.) Mold-Stat is a hydro peroxide-based solution that can be sprayed on mold to kill the mold, such that it is not a health risk, although it will not remove the color or stain created. (DFOF ¶¶ 34-35.)

Because Shields has no evidence that the alleged mold was, in fact, mold, that it was alive, or that it was hazardous to his health, his claim must be dismissed.

### b. THE UNDISPUTED EVIDENCE ESTABLISHES THAT THE DEFENDANTS DID NOT ACT WITH A SUFFICIENTLY CULPABLE STATE OF MIND.

Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996), cert. denied, 117 S. Ct. 1822 (1997)(quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994), cert. denied, 513 U.S. 1128 (1995). "The purpose of sec. 1983 is to deter state actors . . . from using a 'badge of authority' to deprive individuals of rights guaranteed by the Constitution." *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)), cert. denied.

Thus, liability under §1983 arises only from direct and individual wrongdoing. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986). An employee must know about the problem and intend that it continue. *Pacelli v. DeVito*, 972 F.2d 871, 875 (7th Cir. 1992). The mere failure to take corrective action cannot in and of itself violation §1983. *Soderback v. Burnett County, Wisc.* 752 F.2d 285, 293 (7th Cir. 1985).

To succeed on a conditions-of-confinement claim under the Fourteenth Amendment, a plaintiff must show that the defendants acted "purposely" "knowingly" or with "reckless disregard." *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018).

To the extent that any such water or mold issues existed at the Dane County Jail, the undisputed evidence demonstrates that the Defendants took appropriate steps to address all concerns and did not simply ignore any existing problems.

*First*, the Dane County Jail had in place policies and procedures to maintain the overall cleanliness of the Jail. The Jail allowed inmates cleaning supplies every morning to clean their cell and showers and also provided cleaning supplies throughout the day, as needed. (DFOF ¶¶25-29.) Every three months, inmate workers conducted a deep clean of certain areas of the Jail, including of the showers. (DFOF ¶¶ 31-32.) This clean included the use of chemical agents – such as Mold-Stat – to eliminate mold. (DFOF ¶ 32.)

*Second*, jail administration, (including Captain Anhalt) and Dane County officials, immediately began aggressive mitigation efforts when it was first discovered that there was a concern regarding the Dane County Jail's water supply. (DFOF ¶¶ 41-63.) Within a month, it was determined that testing would begin. (DFOF ¶¶ 41-45.) As soon as these results came in, it was decided that additional testing would begin and that both short and long term mitigation efforts would be implemented. (DFOF ¶¶ 46-50.) In the short term, the Jail instructed inmates on how to safely consume water per Department of Health guidelines. (DFOF ¶ 51.) In the long term, the Jail installed filtration systems Jail-wide and across all water supplies. (DFOF ¶¶ 55, 60.) Since the installation of the filtration systems, the Jail's water supply has remained within safe levels. (DFOF ¶ 63.)

*Third*, Shields acknowledges that he was made aware of the Jail's mitigation efforts through signs (DFOF ¶¶ 74-76) and through the responses to his grievances (DFOF ¶¶ 88-90). That Shields may be concerned that he did not initially see the sign regarding hot water is immaterial. Shields was notified of this recommendation through his grievance. (DFOF ¶¶ 88-

90.) Most importantly, so long as Shields was running the water for 1-2 minutes (which he states he was) his health was not in danger no matter what temperature of water he consumed. This is because there was no difference between lead levels in the hot and cold water supply. (DFOF ¶¶ 52-54.) Prior to the installation of the filters, so long as the water was run for 1-2 minutes, the possibility of lead dissolving in the water dissipated. (DFOF ¶¶ 54-56.)

*Fourth*, Shields' grievances were reviewed and appropriately tended to by Jail staff. *See Vasquez v. Frank*, 290 Fed.Appx. 927 (deliberate indifference not shown where prison staff promptly addressed plaintiff's concerns). The responses provided to Shields were appropriate and informative. (DFOF ¶¶ 82-89.) That Shields' did not believe or merely disagreed with the response to these grievances does not give rise to a constitutional violation.

*Finally*, any passing comments by Jail staff as alleged by Shields – such as those from Lieutenant Immel and Deputy Merril – were not objectively unreasonable. Jail staff appropriately notified inmates through two different signs posted around the Jail and through responses to grievances that aggressive mitigation actions were being taken. (DFOF ¶¶ 74-76, 88-90.) Thus, additional passing comments such as these, do not rise to the level of reckless disregard, as all staff – and inmates – were aware that actions were being taken by Jail and County administration.

Accordingly, there is no evidence in the record showing that the Defendants acted objectively unreasonable toward Shields' complaints. Thus, his Amended Complaint must be dismissed as a matter of law.

## IV. PLAINTIFF'S CLAIMS MUST BE DISMISSED UNDER THE EIGHTH AMENDMENT

As noted, Shields' claims also fall under the Eighth Amendment after he pleaded guilty and after his probation was revoked. An Eighth Amendment claim alleging cruel and unusual

punishment has two requirements: (1) the deprivation suffered must be objectively, sufficiently serious, and (2) the defendants were subjectively, deliberately indifferent to that serious deprivation. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).

As discussed above, Shields cannot establish that he was subjected to conditions so objectively serious as to constitute cruel and unusual punishment.

Additionally, Shields cannot establish the subjective component. The subjective component of the Eighth Amendment is an inquiry into intent that "requires us to ask whether the prison officials acted wantonly and with a sufficiently culpable state of mind." *Id*. To satisfy the subjective component, a plaintiff must prove that the defendant acted with deliberate indifference—at a minimum, "an inmate must allege actual knowledge of impending harm easily preventable." *Lunford v. Bennett*, 17 F.3d 1574, 1580, quoting *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir. 1985). Deliberate indifference requires that prison officials acted with the equivalent of criminal recklessness. *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996).

Based on the analysis above, there is no evidence in the record that any of the Defendants acted with deliberate indifference to Shields' complaints. Instead, the record clearly establishes that jail staff worked in good faith to alleviate any concerns regarding water quality and mold.

Thus, Shields' claims should also be dismissed under the Eighth Amendment.

## V.    SHEILDS CANNOT ESTABLISH INJURY OR CAUSATION.

To recover damages under §1983, "a plaintiff must show both injury and a 'casual connection between that injury and the deprivation of a constitutionally protected right." *Maus v. Murphy*, 29 Fed. Appx. 365, 369 (7th Cir. 2002) *quoting Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

In the case at hand, Shields has shown neither injury nor causation. Shields' deposition testimony definitively established that he has not been damaged in any way by the conditions of the Dane County Jail. (DFOF ¶¶ 104-107.) As set forth in the Factual Background above, there is no evidence that Shields suffered any injury whatsoever due to the conditions at the Dane County Jail. Accordingly, this Court should dismiss Shields' claims. *See also, Mitchell v. Dane County Sheriff Department*, 16-cv-352, 2018, at *5 WL 851391 (W.D. Wis. February 13, 2018).

## VI. THE DEFENDANTS ARE PROTECTED BY IMMUNITY AND THE CLAIMS AGAINST THEM SHOULD BE DISMISSED.

Additionally, the Defendants are shielded by qualified immunity. Governmental officials performing discretionary functions are shielded from liability insofar as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), cert denied, 522 U.S. 1117 (1998).

There is generally a two-part test in determining whether qualified immunity should be granted to a state actor: (1) whether the plaintiff has established a deprivation of a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 607, 609 (1999). In determining whether the right alleged to have been violated was "clearly established," a constitutional right must have been identified in a particularized sense with regard to the circumstances of the alleged violation. *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992). Government officials may be protected from liability for objectively reasonable decisions, even if the decision is later determined to be wrong. *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988.)

Moreover, a plaintiff seeking redress under § 1983 must show personal involvement on the part of individual defendants: "a plaintiff must demonstrate personal involvement by showing that defendants knew about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or otherwise turn[ed] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 615 (7th Cir. 2001).

Here, the Defendants are shielded by qualified immunity. Shields has not established a constitutional violation. As discussed above, the existing record does not indicate that Shields was subjected to inhumane conditions of confinement while at the Dane County Jail. Liability under the Fourteenth and Eighth Amendment require Defendants to have the requisite knowledge and intent. There is no evidence here that Shields was placed in conditions that imposed a substantial risk of serious harm nor that the Defendants knowingly or intentionally or even recklessly subjected Shields to inhumane conditions. Shields cannot point to any clearly established right to the contrary. Moreover, Shields has failed to show personal involvement in a constitutional violation on the part of any of the named Defendants regarding his complaints here. Accordingly, the claims against the Defendants must be dismissed.

Finally, while it is unclear the exact nature of Shields' claims against the individual defendants, to the extent that his claims against them are in their "official capacity" these claims must also be dismissed. An official capacity claim is equivalent to a claim against the municipality. To maintain a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must *first* establish that he actually suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). "If a person has suffered no constitutional injury at the hands of [an] individual police officer, the fact that the departmental regulations might have authorized

[unconstitutional conduct] is quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Such basis for dismissal is well-known and oft-cited. *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992) ("because [the officer] did not violate [the plaintiff's] constitutional rights, there is no basis for liability" against the municipality); *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiff's claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."); *Thompson*, 33 F.3d at 859 (if individual officers did not violate plaintiff's constitutional rights, the municipality cannot be held liable under a *Monell* claim).

## <u>CONCLUSION</u>

Based on the foregoing arguments and authorities, Defendants respectfully request that this Court enter summary judgment on their behalf on all issues in Plaintiff's Amended Complaint with prejudice, and grant such further relief as this Court finds reasonable and just.

Dated this 17th day of March, 2020.

> **MUNICIPAL LAW & LITIGATION GROUP, S.C.**
>
> Attorneys for Defendants, Dave Mahoney.
> Sgt. Skirpenski, Lt. Immel, Deputy Merrill, Capt. Anhalt, and Lt. Pierce.
>
> By: s/ Samantha R. Schmid
> REMZY D. BITAR
> State Bar No: 1038340
> SAMANTHA R. SCHMID
> State Bar No. 1096315
> AMY E. FRY-GALOW
> State Bar No. 1114259

P.O. ADDRESS:
730 N. Grand Avenue
Waukesha, WI 53186
O: (262) 548-1340
F:  (262) 548-9211
E: rbitar@ammr.net
sschmid@ammr.net
afrygalow@ammr.net