IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CORTEZ WILLIE SHIELDS,

      Plaintiff,      OPINION AND ORDER

 v.

                 17-cv-267-wmc

DAVE MAHONEY, *individually and in his official capacity*,
SGT. SKERPENSKI, *individually and in his official capacity*,
CAPT. ANNHALT, *individually and in his official capacity*,
SGT. IMMEL, *individually and in his official capacity*,
DEPUTY MERRILL, *individually and in his official capacity*,
and LT. PIERCE,

      Defendants.

---

  The court previously granted *pro se* plaintiff Cortez Willie Shields leave to proceed on an action under 42 U.S.C. § 1983, against Dane County Sheriff Dave Mahoney and various other correctional officers employed by Dane County and working at its jail. While held in the Dane County Jail, plaintiff asserts Eighth Amendment conditions of confinement claims against all defendants based on his alleged harmful exposure to lead in the drinking water and to mold in his cell. (3/18/19 Order (dkt. #13); 12/19/19 Order (dkt. #32).) Before the court is defendants' motion for summary judgment (dkt. #39), which the court will grant for the reasons that follow.

ALLEGATIONS OF FACT[1]

A. Background

During all times relevant to the allegations in his complaint, plaintiff Cortez Willie Shields was incarcerated at the Dane County Jail. Defendant Dave Mahoney is (and was during all relevant times) the Sheriff of Dane County. Similarly, the other defendants were all employees of Dane County, working at the jail during the relevant period: Sergeant Skerpenski, Lieutenant Immel, Deputy Merril, Captain Anhalt and Lieutenant Pierce.

Shields was held at Dane County Jail on three, different occasions between January 2, 2015, and January 27, 2017. First, Shields was booked into the Dane County Jail on January 2, 2015, on a probation hold, and he was bonded out almost one year later on December 24, 2015. Second, on May 3, 2016, Shields was again booked into the Dane County Jail after his bail was revoked. That same day, Shields pleaded guilty to a charge, and he was sentenced to probation on August 9, 2016, then released that same day. Third, on September 30, 2016, Shields was booked once again into the Dane County Jail on a probation hold; his probation was formally revoked on November 2, 2016; and he was transferred to Dodge Correctional Institution on January 27, 2017.

B. Jail Sanitation Conditions

The Dane County Jail consists of three facilities: the City-County Building; the

---

[1] Plaintiff did not file any responses to defendants' proposed findings of fact; nonetheless, the court has considered his opposition brief and noted purported disputes where warranted, particularly when made as to matters plausibly within plaintiff's knowledge unless contradicted by his own earlier sworn testimony. Fed. R. Civ. P. 56(c). Unless otherwise noted, and with that caveat, the court finds the following facts undisputed and material when viewed in the light most favorable to plaintiff as the nonmoving party.

William H. Ferris, Jr. Center; and the Public Safety Building. The City-County Building was constructed in 1955, and the sixth and seventh floors of that building are part of the Dane County Jail. The William H. Ferris, Jr. Center was constructed as a Huber Law facility in 1982 and expanded in 1991. Finally, in 1994, the Public Safety Building was constructed, which includes 400 beds, as well as office space for the Sheriff's Department and the Department of Emergency Government.

During the events at issue in this lawsuit, Dane County Jail had a policy in place to address sanitation in its three facilities. Under the policy, if any deputy became aware of a sanitary issue, he or she was required to address it and, if necessary, notify building maintenance. (Mikula Aff., Ex. E (dkt. #43-5).) The policy also requires routine inspections by the Jail Administration, State of Wisconsin Jail Inspectors and the Dane County Board Committee. The Dane County Jail also allows inmates to clean their cell and shower areas, and it utilizes inmate workers and outside contractors for additional deep cleaning and/or abatement work.[2] At 4:45 a.m., each morning inmate workers in the City-County Building put together "cleaning buckets" to be placed inside each cell block. This bucket contains: an actual bucket with mop, cleaning / disinfectant solution in the bucket, as well as a separate spray bottle, rags, broom, dust pan, garbage bags, and a shower

---

[2] Shields disputes that the jail provides cleaning supplies to inmates, contending instead they the jail only provides a mop and water, though his representation in his brief conflicts with his deposition testimony, in which he testified that the jail provided cleaning supplies every morning around 6:00 and he cleaned his cell every day. (Shields Dep. (dkt. #42) 95.) For purposes of summary judgment, he will be held to his sworn testimony, rather than an unsworn, unexplained recantation in his brief.

brush.[3] These buckets remain in all cell blocks through morning head county at approximately 8:30 a.m. Moreover, inmates are allowed cleaning supplies throughout the day as needed.

In addition to daily cleaning, Dane County Jail conducts a "quarterly cleaning." As part of that cleaning, inmate workers clean all showers and shower curtains with additional disinfectants, including Lime-Away and Mold-Stat, a hydrogen peroxide-based solution that can be sprayed on mold to kill it but purports not to pose a health risk. Defendants note that while Mold-Stat will kill the mold, it will not, however, remove the color or the stain created by the mold. The jail also maintains a supply of Mold-Stat in stock at all times, jail deputies and supervisors have access to it, and they may use it to address any new growth.

In addition, Dane County Jail uses Public Health -- Madison / Dane County to conduct lead testing of its water supply. On May 17, 2016, shortly after defendant began his second stay, a consultant team released a Preliminary Report as part of a Dane County Jail "updates summary." That report indicated, but did not confirm, that lead may be present in the water supply of the jail due to the age of the oldest facility -- the City-County Building. Specifically, on July 29, 2016, 20 random samples of water were taken from cellblocks in that facility, and on August 16, the jail was notified that three of the twenty random samples were slightly elevated above the 15 $\mu$g/L level recommended by the EPA.

On August 18, Dane County decided to test all consumable water sources at the jail

---

[3] Again, at summary judgment, plaintiff appears to dispute that inmates are provided any cleaning solution in his brief, but this conflicts with his deposition testimony, which must control.

4

for lead. The County also decided to install water filtration systems across the entire cold water supply. On August 19, while awaiting the installation of the water filtration systems, signs were also posted at the jail, which stated the following:

> While we are exploring options for the replacement of the City-County Building Jail, many systems are being tested. In addition, we have received concerns from inmates. As we test these systems, we ask for your patience.
>
> In the next couple of weeks, we will be collecting water samples overnight. Public Health recommends that the water be run for 1-2 minutes or until it gets cold prior to drinking. They recommend that you do not use hot water for consumption.

(Brockmeyer Aff. (dkt. #40) ¶ 12.)[4] Later, the jail decided to install filtration systems for both hot and cold water.

From August to October 11, 2016, the beginning and end of which overlap with defendant's second and third jail stays, all consumable water sources at the jail were tested for lead. Those results showed that less than 5% of the cells in the jail tested for lead levels slightly above the EPA recommendation. In an October 31, 2016, meeting, the County further adopted a policy to: (1) affix stickers above all water fountains, reminding inmates to allow the water to run for two minutes before drinking; (2) install filters on fountains that tested with higher levels of lead; and (3) replace fixtures and piping throughout the jail to mitigate potential sources of lead. On November 22, 2016, in the middle of defendant's third stay, Hooper Plumbing began installing Matrikx water filtration systems

---

[4] Defendants explain that the water system at the jail runs through copper piping that may have lead joints. The lead may dissolve in the water when the water is still, but allowing the water to run for a few minutes reduces the possibility of lead being present in the water, as apparently does using cold water over hot.

through the jail, including both hot and cold water supplies. Since installing the water filtration system, the water is tested quarterly and has never shown lead levels above the recommended 15 $\mu$g/L level.

### C. Shields' Allegations

In his complaint and amended pleadings, Shields complained of lead in the drinking water and mold in his cell. Shields first complained of mold and the water at the jail in a grievance dated October 23, 2016; Shields filed a second grievance complaining about lead in the water on December 14, 2016. During his deposition, Shields specifically complained of mold in the showers and some of the cells, but he had no pictures or other evidence to establish that it was actually mold. At his deposition, as described above, Shields also acknowledged that the jail allows inmates to clean their cells and that cleaning supplies are available. (Shields' Dep. (dkt. #42) 95 ("You don't have to ask to clean your cell. They -- they have -- cleaning supplies they push in there early in the morning, they push it in there like around 6:00 or something like that.").) As for his lead exposure claims, Shields testified at his deposition that his claim is based on the signs instructing inmates to not drink hot water and to allow the water to run for two minutes before consumption. Shields also testified at his deposition that he followed those recommendations.

### D. Shields' Interactions with Defendants

Shields never spoke personally to Sheriff Mahoney about his complaints, but contends that he believes Mahoney was aware of his complaints because he saw him on television stating that he wanted to, or was considering, renovating the jail. In contrast,

Sergeant Skerpenski responded to Shields' December 2016 grievance. Moreover, Shields testified at his deposition that he may have tried to complain to Skerpenski and Lieutenant Immel in passing, and that Lieutenant Immel reviewed Shields' appeals from the denials of both grievances. At his deposition, Shields further testified that he complained to Deputy Merrill about the mold and lead, and she responded that the jail was old. As for Captain Anhalt, Shields testified that he spoke with him once about his complaints, to which Anhalt responded, "they have people to do it, I'll look into it." (Shields Dep. (dkt. #42) 122.) Finally, with respect to Lieutenant Pierce, Shields' only interaction with him was during the appeal process from his first grievance.

### E. Injuries

In its screening order, the court noted that "[w]hile plaintiff's allegations are quite limited, his alleged exposure to lead and mold at the Dane County Jail appear sufficient to permit an inference that Shields was subjected to conditions that create 'an excessive risk to health or safety,' at least under the generous standard to which *pro se* litigants are entitled at the screening stage." (3/18/19 Order (dkt. #13) 3 (quoting *Miller v. Winnebago Cty. Sheriff's Office*, No. 18 C 50334, 2019 WL 184078, at *2 (N.D. Ill. Jan. 14, 2019) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)).)

At his deposition, however, Shields admitted that he has never sought medical treatment for injuries or an illness related to lead exposure, nor has he ever been tested for lead exposure or been told that he had elevated lead in his blood. Shields also admitted that he has not sought medical treatment for injuries or illness related to mold, nor has a medical professional diagnosed him with a mold-related illness.

OPINION

In his opposition brief, plaintiff primarily argues that this case should proceed to trial because summary judgment generally is not an adequate process. While the court understands why plaintiff believes that a trial would provide a more robust process to address his claims, summary judgment is an important part of in our judicial system because it ensures that the cases proceeding to trial have material factual disputes that can only be resolved by a trier of fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial"). As such, to survive a motion for summary judgment, plaintiff as the nonmoving party must present sufficient evidence from which a reasonable jury could find in his favor. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). Otherwise, there is no reason for the court, the parties and most critically a lay jury to expend the time and resources away from their lives, work and family to hold a trial. The court, therefore, rejects Shields' general contention that he has an *unqualified* right to a trial here.

During different periods of time relevant to Shields' complaint, defendants acknowledge that plaintiff was a pretrial detainee, and that at other times, he was a convicted prisoner. While claims by pretrial detainees are governed by the due process clause of the Fourteenth Amendment, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015), claims by sentenced prisoners are governed by the cruel and unusual punishment clause of

the Eighth Amendment, *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). At the time this court screened plaintiff's claim to go forward, the Seventh Circuit had held that conditions of confinement claim under either the Eighth Amendment or the Fourteenth Amendment were both governed by the same Eighth Amendment deliberate indifference standard. *See Velez v. Johnson*, 395 F.3d 732, 735 (7th Cir. 2005) (explaining that a pretrial detainee's claim "arises under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment, "[b] as we have noted time and again, there is 'little practical difference between the two standards'" (quoting *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)). Recently, however, the Seventh Circuit has extended the "objectively unreasonable" standard announced by the United States Supreme Court in *Kingsley* to conditions of confinement cases. *See Hardeman v. Curran*, 933 F.3d 816, 824 (7th Cir. 2019). In light of this development and the undisputed fact that at times, Shields was a pretrial detainee and at others time he was a convicted prisoner, the court will consider his claims under both standards.

The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement." *Farmer*, 511 U.S. at 832. To constitute cruel and unusual punishment, conditions of confinement must be extreme. *Id.* To demonstrate that prison conditions violate the Eighth Amendment, therefore, a plaintiff must present evidence that satisfy a test involving both an objective and subjective component. *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir. 1994). The objective analysis focuses on whether prison conditions were sufficiently serious, so that "a prison official's act or omission results in the denial of

the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. at 834, or "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford,* 17 F.3d at 1579. The subjective component requires proof that prison officials acted wantonly and with deliberate indifference to a risk of serious harm to plaintiff. *Id.*

Under the Fourteenth Amendment, a plaintiff must similarly show that "the severity and the duration of the conditions experienced were so significant . . . that they violated the Constitution." *Hardeman v. Curran*, 933 F.3d 816, 824 (7th Cir. 2019). Under that test, a plaintiff must demonstrate that "(1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Id.* at 827 (Sykes, J., concurring).

Here, plaintiff has failed to put forth evidence from which a reasonable jury could conclude that the lead and mold conditions were so extreme as to violate the Eighth Amendment or objectively serious to implicate the Fourteenth Amendment. Instead, the undisputed facts demonstrate that while there may have been mold in the showers, the jail provided cleaning supplies on a daily basis, had mold-specific supplies available if needed, and completed a more intensive cleaning on a quarterly basis. Moreover, defendants present evidence that while the mold-cleaning product removes the mold itself, it may not remove the stain left by the mold. As a result, Shields may have simply *observed* mold staining, rather than active mold itself.

Moreover, at his deposition, Shields acknowledged that he had access to cleaning supplies and used them on a daily basis to clean his cell. More critically, Shields presented *no* evidence that: (1) he was actually exposed to mold; (2) his exposure was over a significant period of time; or (3) he suffered health ramifications from the exposure. Based on this record, a jury would have to speculate to find a constitutional violation. *See Carroll v. DeTella*, 25 F.3d 470, 472 (7th Cir. 2001) (explaining that the Eighth Amendment does not require "a maximally safe environment, one completely free from pollution or safety hazards"); *Helling v. McKinney*, 509 U.S. 25, 35 (plaintiff must show that he was subjected to "unreasonably high levels" of second-hand smoke to maintain a claim under the Eighth Amendment); *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) ("Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual."); *Thomas v. McCoy*, No. 17 C 6386, 2020 WL 247464, at *5 (N.D. Ill. Jan. 16, 2020) (under Fourteenth Amendment, absence of running water and working toilets are sufficient to constitute "objectively serious" conditions).

Plaintiff's claim based on lead exposure fairs no better. Here, the jail acknowledged that testing in 2016 demonstrated that *some* of the water sources, albeit less than 5%, had lead present at levels slightly above the EPA recommendations. The jail posted warnings to the inmates to inform them of this risk of lead exposure and to encourage them to take steps to protect themselves -- namely, running cold water for a couple of minutes and avoiding drinking hot water. Moreover, the undisputed evidence is that these steps were intended to ameliorate risks of lead exposure in the short term, while the jail improved its filtration systems. Defendants further presented evidence that more recent testing shows

11

these additional steps have worked, with all water sources now testing below the EPA recommendations. Finally, at his deposition, Shields acknowledged that his claim of wrongful lead exposure was limited to evidence of the warning signs defendants posted within the jail.

Here, too, plaintiff has *no* evidence to support a finding that he was actually exposed to lead in water, meaning a jury would again have to speculate to find that this condition was extreme or objectively serious to support his constitutional claims. Even more telling, the undisputed facts demonstrate that any arguable risk of exposure was relatively isolated, and once defendants were made aware of the presence of lead in some of the water sources, they took immediate short-term measures, as well as invested in longer-term improvements. These actions do not support a finding of "deliberate indifference" *or* "objective unreasonableness."[5]

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #39) is GRANTED.

2) In light of this decision, the August 5, 2020, scheduling conference is CANCELED.

---

[5] Defendants offer other reasons for summary judgment in their favor, namely, the lack of evidence of personal involvement on the part of the named defendants or subjective intent necessary to satisfy the Eighth Amendment, but the court need not address these arguments in light of its findings that plaintiff failed to show that the conditions were either so extreme or objectively unreasonable to constitute a constitutional violation.

3) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 31st day of July, 2020.

                                                BY THE COURT:

                                                /s/

                                                _____

                                                WILLIAM M. CONLEY
                                                District Judge